**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **APV NORTH AMERICA, INC.**, a Delaware corporation, : : **Plaintiff,** : : vs. : **5:07-CV-346 (CAR)** : **TRANS INDUSTRIAL DEVELOPMENT CORP.**, and **PEEPLES INDUSTRIES, INC.**, : : : **Defendants.** : | |

_____

*ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

Before the Court is Plaintiff APV North America's Motion for Summary Judgment [Doc. 96]. Defendants, Trans Industrial Development Corporation ("TIDC") and Peeples Industries ("Peeples"), filed a Response [Doc. 105-3] to the Motion. For the reasons stated below, Plaintiff's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

**BACKGROUND**

Early in 2000, TIDC sought APV North America's financial and manufacturing assistance in bringing to market new technologies that would advance the process for refining kaolin. Two agreements followed. The first, the Letter of Intent, contained a loan of $202,500.00 from APV to TIDC for use in developing the technology and forms the basis for the purported contract in dispute. The second, the Purchase Order, concerned a prototype machine sold by APV to TIDC for use in commercial demonstrations of TIDC's new ideas and is the subject of Defendants' counterclaim.

APV North America seeks summary judgment in three respects:[1]

1) to find the loan agreement in the Letter of Intent a valid contract and thereby declare TIDC in breach, owing APV North America the balance of $200,250.00, plus interest;

2) to construe Gay Mayfield's signature on the Letter of Intent as validly binding Peeples to a guaranty clause contained in the loan; and

3) to dismiss TIDC's counterclaim for breach of the Purchase Order to APV North for failure to present in discovery evidence to quantify alleged lost future profits.

APV North America is a Delaware corporation engaged primarily in manufacturing. APV North America's primary place of business is Illinois. Defendants TIDC and Peeples are Georgia corporations with their principal places of business in Georgia. Peeples is the parent company of TIDC, a wholly-owned subsidiary. Gay Mayfield was President of both the subsidiary and parent company at the time the agreement in question took effect.

TIDC developed a technologically advanced method for refining raw kaolin in 2000. Early that year, Mayfield approached Craig Bergstrom, APV North America's President, to discuss possible financing from APV North America for TIDC to bring this technology to market. TIDC also sought APV North America's help in building a prototype machine to test and market their ideas in the field. Such commercial trials were important in proving the commercial viability of the technology to potential buyers in the kaolin mining industry.

Following initial discussions, Mayfield prepared and executed a Letter of Intent, which he forwarded to APV North America's offices in Illinois on April 13, 2000. The Letter of Intent arrived as an attachment to correspondence written by Mayfield under Peeples letterhead. The

---

[1] Neither APV North America nor TIDC-Peeples seeks summary judgment on the issue of payment for the prototype machine and related services under the Purchase Order. TIDC raises factual issues as to the Purchase Order that preclude summary judgment.

stationery, however, also identified the various subsidiaries, including TIDC, for which Mayfield had management responsibilities.

On April 17, 2000, Craig Bergstrom, as President of APV North America, executed the Letter of Intent on behalf of the company at its offices in Illinois.  The Letter of Intent required, among other things, that APV North America lend TIDC funds to develop its technologies. Upon successfully marketing the technology, TIDC would grant APV North America certain exclusivity rights with regard to production of the new machinery.  Mayfield testified that the opportunity to sell this technology represented a great potential revenue source to both APV North America and TIDC but that APV North America could possibly have profited more because of its substantial production capabilities.

Under the Letter of Intent, TIDC received a loan for $202,500.00 that it could repay either: (i) in full on or before October 15, 2000 or (ii) on a three-year repayment schedule with interest thereafter.  On April 19, 2000, Mayfield sent a facsimile transmission to Joseph Kang of APV North America on Peeples letterhead, similar to that used in his cover letter for the Letter of Intent, directing that the loan proceeds under the Letter of Intent be sent to a "sweep" account maintained by parent corporation Peeples at Sun Trust Bank.  APV North America subsequently funded the full amount of the loan by wiring the proceeds to that account where they were credited to TIDC.

Long after receiving the funds, Mayfield attempted to renegotiate the terms of repayment for the loan and the amount due under the Purchase Order in a series of emails in 2003.  Though Mayfield attached a "Loan Payment Plan For APV North America" to one May 28 email during this time and assured Tim Taylor of APV North America his company would do everything possible to make the plan work, no definitive agreement was signed.  At the time Mayfield

3

signed the Letter of Intent, TIDC had a negative net worth of $3.4 million. The only payment made towards the loan was $2,250.00 on September 4, 2003, by another Peeples subsidiary, American Transbridge Corporation, Inc.

When APV North America and TIDC signed the Letter of Intent, both agree that it represented the intentions of the parties at the time and accurately incorporated their prior discussions. Mayfield Dep. p. 37, ln. 25 to p. 39, ln. 4 [Doc. 99]. But TIDC claims the parties also contemplated additional agreements, despite the Letter of Intent having outlined their intentions at the time of its execution. Mayfield later testified that he viewed the relationship between the parties as a joint venture or cooperative partnership.

TIDC and APV North America did contemplate that Peeples would guarantee the note for repayment of the development costs. Section 3.4 of the Letter of Intent provides:

> In the event that [no third-party contract is secured] to enable TIDC to repay the APV North America bridge loan, the loan will be converted to a 3-year loan at a 12% … interest rate. This 3-year loan will be guaranteed by Peeples Industries, Inc. the parent financial holding company.

Mayfield insists that the parties contemplated further agreements to formalize those set forth in the Letter of Intent. Regardless, TIDC asserts that only Mr. Peeples, as owner and Chairman of both companies, would have the authority to approve any monetary involvement by the parent corporation. At the time, Mayfield was the President and Chief Operating Officer of both TIDC and Peeples. But he and the companies' Chief Financial Officer, John Benton, assert that Mayfield's authority did not encompass monetary matters of this nature on behalf of Peeples. Mayfield testified that he spent most of his time on the operations of the subsidiaries. Mayfield did sign Defendants' Answers to Interrogatories for both Peeples and TIDC. And Mayfield never told Craig Bergstrom of APV North America that he did not have authority to act on

4

behalf of Peeples. Paul Adler, a technical consultant to the project, had no authority to act on behalf of Peeples despite having signed the Letter of Intent as a representative of TIDC.

Separate from the Letter of Intent, TIDC submitted the Purchase Order to APV North America in September 2000 for a prototype according to particular design specifications that employed its technology. APV North America accepted the order and delivered the machinery along with an invoice for $135,000.00, which remains outstanding in its entirety. The machinery failed its commercial scale tests and marketing demonstrations, and the technology found no buyers.

TIDC's counterclaim alleges that APV North America failed to build and service the prototype properly and thereby deprived TIDC of the opportunity to sell the technology and profit in the future from this new business. APV North America in response says any problems with the machinery resulted from TIDC's design modifications and claims payment for its product. Mayfield testified that he is the only one who would be able to testify about TIDC's claim for damages against APV North America. To quantify any specific dollar loss of TIDC attributable to APV North America, Mayfield said TIDC would need to present the testimony of multiple experts. TIDC has disclosed no experts in discovery.

**STANDARD OF REVIEW ON SUMMARY JUDGMENT**

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). The substantive law applicable to the case determines which facts are material.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.  See id. at 247-48.  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence.  See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The movant carries the initial burden and must show the court that "an absence of evidence to support the nonmoving party's case" exists to sustain its motion. Celotex, 477 U.S. at 325.  "Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  But the nonmoving party must then go beyond the pleadings and present specific evidence, which raises a genuine issue of material fact (i.e., evidence that would support jury verdict), or otherwise show that the moving party is not entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26.  This evidence must consist of more than mere conclusory allegations or legal conclusions and may include affidavits, depositions, admissions, and the like. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [her] case

6

with respect to which [she] has the burden of proof." Celotex, 477 U.S. at 323.

Defendants only responded in part to Plaintiff's Motion for Summary Judgment. To grant summary judgment, the Court must find that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Eleventh Circuit makes it clear that a "district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather must consider the merits of the motion." United States v. 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101 (11th Cir. 2004) (citing Dunlap v. Transamerica Occidental Life Ins. Co., 858 F.2d 629, 632 (11th Cir. 1988) (*per curiam*)).

A district court does not need to "review all of the evidentiary materials on file," *sua sponte*, however, it "must ensure that the motion itself is supported by evidentiary materials" and, at the least, "must review all of the evidentiary materials submitted in support of the motion for summary judgment." Id. at 1101-1102. In reaching the merits of Defendants' motion, the Court has reviewed the entire record of this case.

**DISCUSSION**

Illinois law governs the construction of both contracts.

Illinois law controls because the Letter of Intent and Purchase Order were delivered to and accepted in APV North America's offices there. Since the Court sits in Georgia and presides over this matter pursuant to its diversity jurisdiction, Georgia choice of law rules apply. Robinson v. Ravenel, 411 F. Supp. 294, 296 (M.D. Ga. 1976). Georgia retains the traditional

rule that *lex loci contractus* or the "law of the place of making" controls in matters of contract construction, interpretation, and validity. General Tel. Co. of Southeast v. Trimm, 252 Ga. 95 (Ga. 1984).

Both contracts were made in Illinois. The place of making is the location where the contract is delivered as consummating the bargain regardless of where it may have been written, signed, or dated. Peretzman v. Borochoff, 58 Ga. App. 838, 842 (Ga. Ct. App. 1938). In other words, the place of the last act essential to the contract's completion controls. Id. For example, a note executed in State "A" but not binding until accepted in State "B" is governed by the laws of State "B." Id. Acceptance takes effect from the time it is sent by the offeree, and not from the time it is received by the offeror. General Telephone Co. of the Southeast v. Trimm, 706 F.2d 1117, 1119 (11th Cir. 1983).

The Letter of Intent took effect in Illinois. Mayfield prepared and executed it in Georgia on April 13, 2000. He sent it to Illinois where Bergstrom accepted and executed it on behalf of APV North America, which was the last essential act to the contract's completion. Since the last essential act took place in Illinois, that state's law governs the Letter of Intent.

Likewise, the Court must consider the Purchase Order according to Illinois contract law. In September 2000, TIDC prepared the Purchase Order at its offices in Georgia, which constituted an offer. TIDC sent the Purchase Order to Illinois where APV North America accepted it and produced the prototype machine along with an invoice for $135,000.00. The record does not indicate whether APV North America accepted in writing or through delivery. Either way, the contract took effect from the time APV North America sent the correspondence or machinery from its Illinois facilities.

<u>The Letter of Intent is a valid loan.</u>

APV North America is entitled to summary judgment on the issue of whether the Letter of Intent created a valid and binding contract as to TIDC and APV North America on the loan. TIDC did not respond to this aspect of APV North America's Motion for Summary Judgment and has produced no evidence in discovery that raises a question of fact on this issue. Further, the Court has reviewed the entire record and finds no material fact at issue.

Generally, Illinois treats letters of intent just like other contracts. See <u>IK Corp. v. One Financial Place Partnership</u>, 200 Ill. App. 3d 802, 810 (Ill. App. Ct. 1st Dist. 1990). As with other contracts, the intent of the parties is paramount. <u>Id.</u> Under Illinois law, this Court has three options in determining whether the parties intended the Letter of Intent to bind them contractually: i) it may find the intent of the parties ambiguous, creating a fact question usually resolved by parole evidence at trial; ii) it may find unambiguous language indicating the lack of any intent to be bound, which often explicitly conditions any contractual obligations on the execution of an additional formal agreement; or iii) it may find that the parties unambiguously intended to contract through the language of the contract itself. <u>Quake Constr., Inc. v. American Airlines, Inc.</u>, 141 Ill. 2d 281, 288–289 (Ill. 1990).

In this case, the language to the Letter of Intent shows unambiguously that the parties intended to form a binding contract. All of the Illinois cases involving ambiguous intent to contract contained some sort of provision requiring a future conduct, which conflicted with an otherwise plain intent to be bound. <u>See</u> <u>id.</u> at 299–309. No such clause in the Letter of Intent gives rise to this kind of ambiguity in the present case. The only explicit language suggesting a

9

more formal document might follow the Letter of Intent comes from the title itself, which the Court construes merely as the inartful phrasing of non-practitioners.

An enforceable contract may arise where the parties agreed on general terms and memorialized the bargain in a letter of intent, even though they explicitly left other issues for future agreement. Borg-Warner Corp. v. Anchor Coupling Co., 16 Ill. 2d 234, 243 (Ill. 1958). Even where the "parties contemplate that a formal agreement will eventually be executed does not necessarily render prior agreements mere negotiations, where it is clear that the ultimate contract will be substantially based upon the same terms as the previous document." Interway, Inc. v. Alagna, 85 Ill. App. 3d 1094, 1097 (Ill. App. Ct. 1st Dist. 1980). Finally, where one party acts substantially in reliance on or receives benefits under a preliminary agreement that expresses the intentions of the parties, binding contractual obligations may arise without further formal agreement. Id. at 1101.

The Letter of Intent outlines all material terms of the loan, including the exact amount, a disbursement schedule, and two repayment options. That other sections of the Letter of Intent, such as the exclusivity agreement, may depend on further negotiation and the successful delivery of the technology to third-party buyers, does not negate the parties' unambiguous intent to enter into a binding agreement with respect to the loan. Though the use of the future tense could indicate that a formal memorial of the agreement would follow at some undefined future time, APV North America's funding of the full amount of the loan together with TIDC's acceptance of the benefits thereunder suggest both parties intended the Letter of Intent to be a fully-formed contract. Regardless, any "ultimate" contract would have been substantially, if not wholly, based upon the terms of the Letter of Intent. Therefore, the contemplation of a formal agreement

in this case would not render these prior agreements mere negotiations.

A Seventh Circuit decision applying Illinois law found the unambiguous intent to contract on similar facts to the case at bar.  Where two parties by telex established all the essential terms of an agreement for the sale of a ship, the appellate court reversed the trial judge's finding of no contract liability despite multiple references to a "memorandum of agreement" and the fact the buyer never paid. Magallanes Inv. v. Circuit Sys., 994 F.2d 1214 (7th Cir. Ill. 1993).  The holding stopped short of declaring a binding contract as a matter of law but indicated a potential willingness to do so had the appeal not come after a dismissal of the seller's complaint on a 12(b)(6) motion. Id. at 1221.

The Letter of Intent executed by APV North America and TIDC contains no explicit references to further memorials of the agreement, and APV North America fully performed.  The language of the Letter of Intent explicitly states that the parties "intend[ ] to enter into an Agreement," and the execution of the document by both companies' presidents makes it much more formal than that considered by the court in Magallanes.  Thus, the Court finds the Letter of Intent a binding contract with respect to the loan between APV North America and TIDC and grants APV North America's motion for summary judgment in this regard.

The Guaranty is ambiguous.

Because an issue of fact exists as to the agency relationship between Mayfield and Peeples with regard to the purported Guaranty in the Letter of Intent, a grant of summary judgment is inappropriate and, therefore, denied.  APV claims Mayfield's signature and delivery of the Letter of Intent followed by acceptance of the loan proceeds should bind Peeples to the

guaranty clause therein, since Mayfield was the president of Peeples.  Peeples asserts that Mayfield executed the Letter of Intent only in his capacity as President of TIDC, as the signature line indicates, and, moreover, that Mayfield had no authority to bind Peeples on monetary issues.

A conflict between the language of a guaranty and the representative capacity of the signatory thereto creates a fact question to be resolved through parol evidence at trial.  In Illinois, "where the language in the body of a guaranty agreement conflicts with the apparent representation by the officer's signature of the capacity in which he signed, an issue of fact as to the agent's intent arises, which is an issue for the trier of fact to determine." Addison State Bank v. National Maintenance Management, Inc., 174 Ill. App. 3d 857, 860 (Ill. App. Ct. 2d Dist. 1988) (reversing lower court's grant of summary judgment in favor of plaintiff on issue of whether defendant president of corporation personally guaranteed note where "pres." followed his signature on guaranty).  When this conflict renders the agreement reasonably susceptible to more than one meaning, the court should consider extrinsic evidence to determine the intent of the parties. Id.

The language of the guaranty in the Letter of Intent when compared to the signature line creates an ambiguity in the apparent agency of Mayfield.  The Guaranty clause in the Letter of Intent states, "This 3-year loan will be guaranteed by Peeples Industries, Inc., the parent financial holding company."  The heading in the signature box reads "Representing TransIndustrial Development Corporation" followed by a signature line for "E. Gay Mayfield, President."  (No one disputes that Paul Adler, by his signature on the Letter of Intent, represented neither TIDC nor Peeples as an agent.)  Thus, the entity identified as guarantor in the agreement, Peeples, explicitly conflicts with the stated capacity of the agent, Mayfield as

12

president of TIDC, sought by APV North America to represent the parent company for the purposes of the guaranty. Mayfield did draft the Letter of Intent, but APV North America apparently made no effort to clarify the signature line with respect to the guaranty before executing the agreement.

The presence of this ambiguity permits the parties to introduce parol evidence, such as the letterhead and bank accounts used in the transaction. The fact-finder will weigh this evidence at trial. The other colorable attacks and defenses raised by the parties with respect to the Guaranty depend on the resolution of this issue and, as such, should await further analysis until that time.

The Court does point out, however, that the guaranty involved in <u>Addison</u> and those in many other cases on point present the issue of having a corporate officer answer personally for the debt of the company. This case involves a corporate officer who undisputedly wore the hats of two different companies and wielded the corresponding authority thereto, which distinguishes it from much of the prevailing case law on this issue.

<u>The Counterclaim for Lost Future Profits fails as a matter of law.</u>

In its counterclaim, TIDC seeks lost future profits in excess of $1.5 million for business it purportedly lost because the prototype machine produced by APV failed. TIDC claims APV's deficient machine and subsequent failure to repair and service it properly resulted in these losses. APV attributes any deficiencies to TIDC's design and technology but moves for summary judgment on this issue primarily alleging that TIDC has failed in discovery to produce any tangible evidence of these losses.

APV North America is entitled to summary judgment on the Counterclaim. TIDC has, in fact, produced no evidence in discovery that would permit the fact-finder to quantify the lost profits damages it claims. Moreover, neither TIDC nor Peeples even responded to this aspect of APV North America's Motion for Summary Judgment. The Court has reviewed the entire record and finds no evidence on which TIDC could sustain this claim at trial.

Proof of lost future profits requires opinion testimony that TIDC cannot produce. The Federal Rules of Evidence provide for two forms of opinion testimony, lay or expert. Fed. R. Evid. 701, 702. TIDC concedes that it cannot prove its counterclaim through lay testimony. Its former president Mayfield testified that he could not quantify the lost future profits himself. Moreover, he indicated no other employee of TIDC could testify to these losses from firsthand knowledge. Instead, he said that only the testimony of multiple experts could sufficiently quantify the lost future profits.

Defendants have not presented any expert testimony as to lost profits. Moreover, the deadline for any such disclosures has long since past. Each party must disclose to the other side the identity of any witness it may use at trial to present expert testimony. Fed. R. Civ. P. 26(a)(2)(A). Pursuant to its Proposed Scheduling and Discovery Order, the Court originally set Discovery to expire on May 26, 2008. [Doc. 85]. The deadline for disclosing any experts was February 22, 2008. [Docs. 85, 92]. Since TIDC disclosed no experts in discovery, the Court must grant summary judgment on its Counterclaim.

Even assuming TIDC could overcome the evidentiary bar, the damages asserted by the counterclaim are too speculative to create a question of fact. Under Illinois law, "lost profits are not a proper element of damages where proof of those profits is based on speculation or

conjecture." Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc., 491 N.E.2d 912, 917 (Ill. App. Ct. 2d Dist. 1986).  Claimant has the burden of proving the loss to a reasonable degree of certainty. Id.  And according to long-standing rule in Illinois, "lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that the evidence of lost profits is not speculative." Id.  Put another way, Illinois courts generally "consider evidence of lost profits in a new business too speculative to sustain the burden of proof." Tri-G, Inc. v. Burke, Bosselman & Weaver, 222 Ill. 2d 218, 248-249 (Ill. 2006).

   The estimation must be traceable to specific damages and all other causes accounted for in calculating lost future profits.  On the other hand, the loss need not be proven with absolute certainty, since such profits, by their very nature, are incapable of calculation with precise mathematical precision. Midland Hotel Corp. v. Reuben H. Donnelley Corp., 118 Ill. 2d 306, 315-316 (Ill. 1987).  Any recovery, however, requires a reasonably certain estimate based on an accepted form of computation and plainly traceable to specific damages. Id.  All intersecting causes must be eliminated. Id.

   The claimant offers only conclusive testimony as to its purported lost profits.  Such testimony cannot surmount claimant's burden in this regard.  The claimant bears the burden of establishing a reasonable basis for computing damages based on lost future profits. Snelson v. Kamm, 204 Ill. 2d 1, 33, 787 N.E.2d 796, 272 Ill. Dec. 610 (2003).  Mere conclusive testimony that profits were lost will not suffice without some quantification of these damages. Razor v. Hyundai Motor Am., 2006 Ill. LEXIS 310 (Ill. Feb. 2, 2006).  Even expert testimony may fail as speculation or conjecture when it fails to account for claimant's actions or other significant

factors. Sk Hand Tool Corp. v. Dresser Indus., 284 Ill. App. 3d 417, 427 (Ill. App. Ct. 1st Dist. 1996).

The case law indicates that an unprofitable new business generally cannot sustain its burden of providing competent proof to estimate lost future profits with reasonable certainty. TIDC would not seem to be an exceptional case. See, e.g., Milex Products, Inc. v. Alra Laboratories, Inc., 237 Ill. App. 3d 177, 192 (Ill. App. Ct. 2d Dist. 1992) (upholding award of lost profits based on expert testimony where two established pharmaceutical companies both contemplated said profits before entering into binding sales contract to sell new drug in pre-existing market); Malatesta v. Leichter, 186 Ill. App. 3d 602 (Ill. App. Ct. 1st Dist. 1989) (finding profits of dealership operator during the time in question not too speculative to prove damages where plaintiff prevented from acquiring car dealership); Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. Ill. 1986) (awarding lost profits to plaintiffs who had never previously owned sports franchise based on profits made by other team owners); and Rhodes v. Sigler, 44 Ill. App. 3d 375 (Ill. App. Ct. 3d Dist. 1976) (finding evidence of profits by similarly situated third-person in same time period proved plaintiff's damages to sufficient degree of certainty).

The prototype machine produced by APV North America to TIDC's design specifications failed its commercial scale demonstrations, and none of the potential buyers of the new technology subsequently purchased the machine. TIDC's counterclaim alleges that the technology and design were sound. The market dried up, TIDC contends, because APV North America failed to deliver a working prototype initially and then failed to service it properly. As a direct result, TIDC claims to have lost future business opportunities worth over $1.5 million.

Even if true, the alleged breach of the Purchase Order terms by APV North America fails

to show TIDC would have (or could have) profited so handsomely from the technology. In his deposition, Mayfield himself stressed the cycle of delayed acceptance of any new technology in the marketplace, which he said often takes many years even after such a breakthrough has proven both viable and superior to the *status quo*. While he still believes in the product, Mayfield also admitted that TIDC unilaterally ceased marketing efforts in anticipation of litigation with APV North America.

In addition, TIDC has suggested APV North America had as much, or more, to gain from the success of the technology than did TIDC, which would seem to make APV North America self-interested in a positive outcome with respect to the commercial trials. At the least, APV North America certainly had a vested interest in TIDC's solvency insofar as that ensured repayment of their loan. Aside from the specifics of this case, a sudden economic downturn could have forced would-be buyers to cancel orders. In short, TIDC has not accounted for these and many other intersecting causes that could explain the prototype's ultimate lack of success in the marketplace.

Lost profits cannot successfully form an element of a damages claim when based on speculation or conjecture. TIDC has offered no accepted form of computation for these damages and has provided no reasonable basis from which one could plainly trace specific damages. Despite APV North America's having requested the following information by interrogatory, TIDC has introduced no concrete offers for purchase of its product, indeed no documentary or testamentary evidence whatsoever of potential profits from which it could reasonably calculate any losses.

The claimant bears the burden of quantifying these damages but has only produced

conclusive deposition testimony that they exist. Even with expert testimony, it is unclear that TIDC could demonstrate any lost future profits beyond mere speculation or conjecture.

Finally, TIDC cannot surmount the strong presumption in Illinois that lost profits for unprofitable, new businesses are nearly always speculative. Before issuing the Purchase Order, TIDC had a negative net worth of $3.4 million. The company remains insolvent.

Because TIDC cannot demonstrate that it incurred damages in any specific amount and has produced no evidence in discovery that would permit it to quantify any lost future profits, its Counterclaim fails as a matter of law, notwithstanding any potential breach by Plaintiff on the Purchase Order contract.

## CONCLUSION

For the reasons explained above, Plaintiff's Motion for Summary Judgment [Doc. 96] is **GRANTED in part** and **DENIED in part**. The Court grants summary judgment for APV North America to enforce its loan against TIDC and to dismiss TIDC's counterclaim for lost future profits but denies summary judgment against Peeples as to the existence of a guaranty on the contract. Only the two issues related to the guaranty and payment for the prototype machine and related services remain for trial.

**SO ORDERED,** this 30th day of September, 2009.

S/ C. Ashley Royal  
C. ASHLEY ROYAL  
UNITED STATES DISTRICT JUDGE

THC